### Edward Ostrum v. City of San Antonio.

Decided November 26, 1902.

**1.—Taxes—Voluntary Payment—Compromise.**

Where the defendant city was seeking to acquire land from Mrs. O. for street purposes, and she fixed a price on it which the city council agreed to allow, provided it was applied on certain back taxes she owed the city, the amount of which was in dispute, and she agreed with the city attorney to allow the money to go to satisfy her taxes in full, which compromise agreement was reported to the council and accepted, and she afterwards brought a deed of the land to the mayor, and indorsed the warrant she received therefor back to the city, protesting at the same time against the amount of the taxes, there was a voluntary payment by her of such taxes.

**2.—Same—Evidence.**

Where plaintiff sued to recover money paid for taxes claimed to be excessive and involuntarily paid, and there was evidence that the payment was made pursuant to a compromise agreed to with the city attorney, it was not error to admit in evidence the tax receipts and the report of the city attorney to the council.

**3.—Same—Payment by City Warrant.**

The payment of city taxes with a city warrant calling for current money is equivalent to a payment with the money itself, and is therefore valid.

Error from the County Court of Bexar County. Tried below before Hon. R. B. Green.

*Edward Ostrum,* for plaintiff in error.

*Frank H. Wash,* for defendant in error.

JAMES, Chief Justice.—This action is to recover $168.43 from the city, as excessive tax involuntarily paid by Sarah F. Ostrum, appel-

lant, being assignee of the claim. The case was tried by the county judge on appeal from the justice court, and judgment was rendered for the city.

The city claimed from Sarah F. Ostrum delinquent taxes to the amount of $511.81, exclusive of penalties and costs. This claim she disputed. In the fall of 1899 the petition of Mrs. Ostrum for remission or correction of taxes had been referred to the assistant city attorney who had charge of back taxes, and about that time the city began to negotiate with Mrs. Ostrum for a road or street over her lands. A committee was appointed, who made a report of the amounts to be paid to the various parties through whose property the road would go; that they had interviewed the owners, and had ascertained that the road which they recommended would cost the city a certain amount to each owner, the sum of $390 being that which would have to be paid Mrs. Ostrum for her land so taken, recommending such payment provided that the amount of city taxes owed by them should be deducted from the amounts coming to each of them respectively. The report was adopted and an ordinance was passed appropriating the aggregate of the sums ($1215), or so much thereof as may be necessary for that purpose, as said committee reported.

The city attorney testified that this involving a matter of back taxes, it came to his office in the regular course of business, at about the same time as Mrs. Ostrum's petition for correction of taxes. Edward Ostrum, her son, came to his office many times, and Mrs. Ostrum had also been there, but not so often. A few days after receiving both of these matters, at about noon one day they came together to the city attorney's office to discuss the tax matter. That official told them in the conversation that the city was about to purchase for $390 a roadway over her property, and as the transaction required that her taxes should be settled or rather deducted from the amount, he would propose a compromise of the whole matter, whereby he would deduct the sum of $121.81 from the face of her taxes, thereby reducing her taxes to $390, and not insist on the penalties and costs, if she would make a deed to the city for the road; that the city could not exchange taxes for property, but would give her a warrant for $390 for her road, and would accept the $390 in full for the taxes. She at first refused, and said it was not enough. After a great deal of discussion he told her that it was the best he would recommend to the council, and if she did not choose to accept it, that they would have to leave the matter for the courts to settle; but he continued: "I will tell you what I will do, Mrs. Ostrum; the city owes you some money which you have assigned to your son and others, and if you will accept this compromise, while I can not promise you definitely, I will try to cause the city to pay you this other money that it owes you." She then turned to her son and said: "Well, son, I guess that's the best we can do, and we had better take it." "The matter is then settled, Mrs. Ostrum," the city attorney said, and she

replied that it was. He then reported to the council that he had proposed this compromise to Mrs. Ostrum, and that she had agreed to it; that the city was to pay her $390 for the road, and would receive from her $390 in satisfaction of her back taxes, and recommended the council to appropriate the $390 for the purpose, and that the mayor be authorized to arrange the details and, receive the deed from Mrs. Ostrum.

Some days afterwards he was informed by the city clerk that the matter was ready to be closed and to prepare the back tax receipts, which he did, writing across their fact in red ink, "City council tax compromise."

The mayor testified in substance the same as the city attorney, concerning the report of the committee, and its adoption by the council. That it went to the city attorney's office for adjustment; that that office made a report to the council recommending a compromise of the taxes and a purchase of the road on Mrs. Ostrum's land for the sum of $390, which report was approved, and that he, as mayor of the city, was authorized to arrange the details. A few days afterwards Mrs. Ostrum came to his office and delivered to the mayor a warranty deed for the road. The mayor signed the warrant for $390 and delivered it to her. He then had her indorse the warrant back to the city for the taxes. Before she indorsed it she said she wanted to protest against paying that amount for taxes, and she also filed a written protest against such payment of said taxes. The mayor told her that if she delivered this deed and indorsed the warrant back to the city for taxes, he did not care how much she protested.

The sole issue upon which the city rested its case was whether or not the payment was voluntary, and the court must have concluded that it was voluntary, adopting the version of the transactions as detailed by the mayor and city attorney.

From their testimony these facts are shown: That there was a dispute between the city and Mrs. Ostrum concerning the amount of her back taxes; that negotiations arose between her and the city looking to the acquisition of some of her land for a road or street; that she fixed the price of $390 for her land, which the committee's report recommended, provided her back taxes should be deducted therefrom; that this report was adopted by the city council, and an apppropriation made for so much as should be necessary to purchase the land in accordance with the terms of the report; that she agreed with the city attorney to allow the $390 to go to satisfy her back taxes in full; that this agreement of settlement of both the road and the tax matter was reported to the council by the city attorney, and was approved and the mayor authorized to carry it out; that Mrs. Ostrum brought to the mayor a warranty deed for the land and delivered it, and indorsed the warrant for $390 back to the city, protesting at the same time against the amount of the taxes. She took the tax receipts that had been prepared by the city attorney.

Does it appear from these facts that her payment of the taxes was involuntary? She appears to have assented to the compromise arrange-

ment, and appears to have been familiar with its terms,—with what the council had done in the matter, and with what the mayor was required to do in consummating it. She knew when she brought the deed to the mayor that she was to turn back the consideration for the land to settle her back taxes, and that the proposed deal could not be made by him in any other manner. She must have known that the proposed compromise was not binding on her. Notwithstanding all this she brought him the deed, and though protesting against the amount of taxes she was paying, and though upon being told that it mattered not to him how much she protested, if she only delivered the deed, and indorsed back the warrant, she went on and delivered the deed, indorsed back the warrant, and took her receipts according to the provisions of the compromise understanding. It is evident that she was willing to secure all the benefits of the compromise, viz., selling the land for her price, and getting the abatement of taxes so far as the city had allowed it, and for this purpose she carried it out, by delivering the deed, indorsing the warrant and taking the receipts. She could not do this and still occupy the position of being able to litigate the taxes, which was one of the very matters included in the compromise. Her act was not an involuntary one, and in our opinion by expressly affirming the compromise, she is, upon well recognized principles, estopped from questioning it at all, except upon averments of fraud practiced upon her in consummating it,—and nothing of this kind is pretended.

There is nothing in appellant's complaint concerning the court's action in refusing to correct the statement of facts; nor in the assignments which object to the court's admitting in evidence the report of the city attorney to the council recommending the compromise; nor in the third assignment, which complains of the admission of the tax receipts on the issue of voluntary payment. The seventh assignment we do not consider at all, because there is no proposition stated in connection with it.

Under the fourth assignment a proposition is made that the deed from Mrs. Ostrum was inadmissible as evidence of a compromise of taxes, or voluntary payment thereof, because taxes can only be paid in current money. The city paid Mrs. Ostrum for the land by a warrant calling for current money, and she, instead of paying her taxes in money derived from the warrant, did so by the warrant itself, which was the same thing in effect. If we look at the matter as though the taxes were directly settled with the deed to the land, there would be no objection to it, unless it be with reference to that part of the taxes levied for such purposes as interest and sinking funds, school funds, and the like. City of San Antonio v. Street Railway Co., 22 Texas Civ. App., 153. The taxes in this instance were for back years, and the presumption, in the absence of evidence, would be that all such funds for those years had otherwise been provided for and satisfied, and that the city was free to use these taxes for any corporate use.

The qualifications of the judge to the bill of exceptions effectually dispose of the proposition made under the third assignment concerning the admission of parol testimony to prove certain writings, and this is the only matter presented in the assignment that is worthy of consideration.

The judgment is confirmed.

*Affirmed.*

Writ of error refused.